**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, | |
| Plaintiff, | |
| v. | Criminal Case No. 11-cr-352 (BAH) Judge Beryl A. Howell |
| SANFORD LTD. and JAMES POGUE, | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

Pending before the Court is Defendant Sanford Ltd.'s ("Sanford's") motion *in limine* to exclude evidence regarding the alleged monetary proceeds obtained by Sanford as a result of the offload of fish cargo from the fishing vessel *San Nikunau*.  *See* Def.'s Mot. *In Limine* to Exclude Evid. of Monetary Proceeds ("Def.'s Mot. *In Limine*") at 1, ECF No. 143.  To the extent that Sanford merely argues that all evidence of monetary proceeds earned from the fishing activities aboard the *San Nikunau* are either irrelevant under Fed. R. Evid. 402 or unfairly prejudicial under Fed. R. Evid. 403, Sanford's motion is denied for the reasons stated below.  Indeed, if the arguments presented by the parties for exclusion of alleged monetary proceeds were the only pertinent issues affecting the admissibility of evidence regarding Sanford's monetary proceeds, this opinion would be simple and short.

Unfortunately, however, neither party has addressed certain critically important legal issues that the Court must weigh in determining what evidence of monetary proceeds is either permitted or required to be presented to the jury.  Principally, the Court must consider the interaction between the constitutional issues stemming from the Supreme Court's recent decision

in *Southern Union Co. v. United States*, 132 S. Ct. 2344 (2012), and the appropriate definitions of "gross gain" and "derive[d] . . . from" under the Alternative Fines Act, 18 U.S.C. § 3571(d) as applied to this evidence in the context of the charges pending against the defendants.  Thus, to the extent that the government has proffered that it intends to admit evidence that Sanford's gross revenues of $24,045,930.79 over a period of approximately four years constitute a "gross gain" to Sanford "derive[d] . . . from" the charged offenses, the Court is likewise not prepared to admit that particular monetary figure for that purpose under either Rules 402 or 403 for the reasons explained below.

## I.   **BACKGROUND**

This is a criminal case charging defendants Sanford and James Pogue with seven felony counts under the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C §§ 1901 *et seq.* and related criminal statutes.  The superseding indictment charges the defendants with conspiracy, in violation of 18 U.S.C. § 371; knowingly failing to maintain an accurate Oil Record Book ("ORB"), in violation of 33 U.S.C. § 1908(a) and 18 U.S.C. § 2, and 33 C.F.R. § 151.25; falsification of records, in violation of 18 U.S.C. §§ 1519 and 2; obstruction of justice, in violation of 18 U.S.C. §§ 1505 and 2; and unlawful discharge of oil waste, in violation of 33 U.S.C. §§ 1907(a) and 1908(a), 18 U.S.C. § 2, and 33 C.F.R. § 151.10(b).  *See* Superseding Indictment at 7–18, ECF No. 22.  These criminal charges stem from the defendants' operation of the fishing vessel *San Nikunau* in the South Pacific between March 2007 and July 2011.  *Id.* at 2–3.

During that time period, the government charges that the defendants entered into a conspiracy to fail to maintain the ORB as required by law, did fail to maintain the ORB, and knowingly discharged machinery-space bilge waste overboard the vessel without first running

such waste through an Oily Water Separator ("OWS").  *Id.* at 7–18.  Between March 2007 and July 2011, the government alleges that Sanford earned $24,862,954.89 in gross revenues from the offloading of fish cargo that was caught aboard the *San Nikunau*.  *Id.* at 3.  The superseding indictment also contains a forfeiture allegation that seeks forfeiture of this amount as monies "equal to property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the offenses alleged in Counts One, Two, Four, and Seven."  *Id.* at 19.

The instant motion by Sanford to exclude evidence of monetary proceeds is not the first defense motion challenging this evidence, and certain of the arguments raised in the defendant's prior motion are pertinent for consideration here.  Specifically, on March 23, 2012, Sanford filed a "Motion to Dismiss or in the Alternative to Strike as Surplusage the Forfeiture Claim."  *See* Def. Sanford Ltd.'s Mot. to Dismiss or in the Alternative to Strike as Surplusage the Forfeiture Claim ("Def.'s Mot. to Strike"), ECF No. 69.  As noted, the forfeiture allegation seeks a "judgment in favor of the United States of America for the sum of at least $24,862,954.89."  Superseding Indictment at 19.  The government's claim for forfeiture appears to be based on the following allegation in the superseding indictment:

> Sanford Ltd. gained, during the time period relevant in this indictment, revenues of $24,862,954.89 for the offload of fish cargo from the *F/V San Nikunau* in American Samoa, even though the vessel was not in compliance with international and United States law and therefore could have been prevented from entering American Samoa and offloading fish cargo . . . all of which constitutes a gain pursuant to the Alternative Fines Act, 18 U.S.C. § 3571, and is forfeitable pursuant to 18 U.S.C. §§ 981(a)(1)(C) & 1956(c)(7)(E).

*Id.* at 3–4.

In Sanford's March 23 motion, it argued that this allegation was "contrary to logic, conflict[ed] with express Coast Guard policy regarding the basis for banning foreign-flag vessels from United States ports, and is at odds with the practices of the Coast Guard in other APPS investigations and prosecutions over the past 15 years."  Def.'s Mot. to Strike at 6.  Specifically,

Sanford characterized as "illogical" the government's contention that Sanford's commercial fishing revenues were "proceeds" of its recordkeeping violations because if the *San Nikunau* had been barred from port even once, "the logical result would have been that remedial measures would have been taken promptly to correct the deficiency to ensure the vessel's future operations in American Samoa were not again impeded." *Id.* It also cited the Coast Guard's CG-543 Policy Letter 10-03, *Banning of Foreign Vessels*, which states that the Coast Guard will only ban foreign-flagged vessels like the *San Nikunau* if it has been previously detained three times within the prior twelve months for significant noncompliance with international safety or environmental standards. *Id.* at 7. Thus, according to Sanford, "the revenues from the fish cargoes of the *Nikunau* do not constitute the 'proceeds' of the alleged APPS offenses, so there is no . . . logical nexus between the proof of the APPS offenses and the evidence of the fish cargo revenues over the period of the indictment." *Id.* at 12. Finally, in addition to disputing the nexus between the charged offenses and the revenues from the *San Nikunau*'s commercial fishing activities, Sanford argued that "even if the government were to prevail in its forfeiture claim in this case, any forfeiture award would be for the *net* revenues from fish cargoes." *Id.* at 13 (citing 18 U.S.C. § 981(a) (2)). After hearing argument on Sanford's motion at the motions hearing on April 20, 2012, the Court denied the motion and agreed with the government that arguments pertaining to the appropriate amount of forfeiture were premature. Tr. of Mot. Hr'g at 57:6– 58:22 (Apr. 20, 2012).[1]

---

[1] Sanford asserts that "the jury will be required to consider separately the government's forfeiture allegations." Reply to Gov't's Opp'n to Def. Sanford Ltd.'s Mot. *In Limine* ("Def.'s Reply Mem.") at 5 n. 3, ECF No. 156. This is contrary to the government's position that "when the government only seeks forfeiture of a money judgment, as it does in this matter, the determination of the amount of any money judgment is reserved for the Court." Gov't's Pre-Trial Mem. Regarding Forfeiture at 3, ECF No. 160. While Federal Rule of Criminal Procedure 32.2, which governs criminal forfeiture procedures, states that when the government seeks forfeiture of "a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay," FED. R. CRIM. P. 32.2(b)(1)(A), this Rule also provides that when "a party timely requests to have the jury determine forfeiture," the government must submit a Special Verdict Form "asking the jury to determine whether the government has

Sanford filed the motion *in limine* currently pending before the Court on June 20, 2012, in which it sought to "to exclude from admission into evidence at trial evidence, including testimony, regarding the alleged monetary proceeds obtained directly or indirectly as a result of the offload of fish cargo from the fishing vessel *San Nikunau*." Def.'s Mot. *In Limine* at 1. Sanford's primary argument in support of its motion is that admission of the amount of proceeds would be either irrelevant under FED. R. EVID. 402 or unfairly prejudicial under FED. R. EVID. 403. *See* Def.'s Mem. in Support of Def.'s Mot. *In Limine* ("Def.'s Mem.") at 3–16, ECF No. 143-1. The government, however, argues that evidence of monetary proceeds should be admitted because it is relevant to (1) the defendants' financial motive for committing the charged offenses; and (2) determining the appropriate amount of "gross gain" that was "derive[d] . . . from the offense," which the government intends to seek as a measure of the appropriate criminal fine to be assessed if the defendants are found guilty. *See* Gov't Mem. in Opp'n to Def. Sanford's Mot. *In Limine* ("Gov't Opp'n Mem.") at 1–3 & n.1, ECF No. 147; 18 U.S.C. § 3571(d).[2]

---

established the requisite nexus between the property and the offense committed by the defendant." FED. R. CRIM. P. 32.2(b)(5)(B).

As an initial matter, several Circuits have recently held that FED. R. CRIM. P. 32.2(b)(5) does not apply to money judgments. *See United States v. Grose*, 461 F. App'x 786, 806 (10th Cir. 2012); *United States v. Gray*, 443 F. App'x 515, 523 (11th Cir. 2011); *United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011). Even assuming, *arguendo,* that 32.2(b)(5) applies to the forfeiture money judgment sought in this case, the language of Rule 32.2 suggests that it is within the Court's discretion to either submit the nexus question to the jury or determine the question itself. *See Sunrise Acad. v. United States*, 791 F. Supp. 2d 200, 203 (D.D.C. 2011) ("[E]*ither* the court or the jury must determine, based on the evidence . . . [the nexus question]." (emphasis added)). *Compare* FED. R. CRIM. P. 32.2(b)(1)(A) ("[T]he court must determine whether the government has established the requisite nexus . . . ."), *with* FED. R. CRIM. P. 32.2(b)(5) (requiring court to determine "whether either party requests that the jury be retained to determine the forfeitability of specific property" and requiring government's submission of Special Verdict Form, but not requiring the nexus question to be found by the jury). In light of the fact that the jury may have to determine whether any "gross gain" was "derive[d] . . . from" the charged offenses, as well as the amount of that gain, the parties should be prepared to address before the close of the government's case-in-chief whether 32.2(b)(5) applies to money judgments and, if it does apply, whether the Court should exercise its discretion to have the jury determine both the "gross gain" question as well as the nexus question under Rule 32.2.

[2] Because Sanford paid a fee to a third-party company (TriMarine Singapore) for remitting payment to Sanford for tuna deliveries, the amount being sought by the government as "gross gain" is $24,045,930.79. *See* Gov't Opp. Mem. at 1 n.1. For the remainder of this opinion, the Court will refer to $24,045,930.79 as Sanford's "gross

II.    **DISCUSSION**

A.  **Evidence of Monetary Proceeds Is Generally Admissible**

Only relevant evidence is admissible.  FED. R. EVID. 402.  A trial court may prevent the introduction of relevant evidence, however, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.  The term "unfair prejudice" in this context means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *Id.* advisory committee's note.  "The trial court has broad discretion to weigh the extent of potential prejudice against the probative force of relevant evidence."  *Fredrick v. District of Columbia*, 254 F.3d 156, 159 (D.C. Cir. 2001).

Sanford argues that *any* evidence of monetary proceeds from the *San Nikunau* is either irrelevant or unfairly prejudicial and should therefore be excluded.  *See* Def.'s Mem. at 1.  First, the defendant contends that evidence of monetary proceeds is irrelevant under Fed. R. Evid. 402 "because the value of the proceeds of the sales is not an element of any of the offenses charged in the Superseding Indictment."  *Id.* at 3.  Second, echoing the same arguments put forth in support of its March 23 "Motion to Dismiss or in the Alternative to Strike as Surplusage the Forfeiture Claim," Sanford argues that such evidence is not probative of the defendants' motives for committing the charged offenses because the Superseding Indictment "does not allege any facts that support the argument that the making of false entries in the Oil Record Book ("ORB") aboard the *Nikunau* was motivated by or in any way connected to the proceeds from the offloading of fish cargoes."  *Id.* at 9.  Hence, Sanford argues, admission of monetary proceeds

---

revenues," despite the fact that it does not include the $817,024.10 paid to TriMarine Singapore.  The government appears to acknowledge that *some* costs need to be deducted from Sanford's gross revenues in calculating "gross gain," but the government does not explain why only *this* cost should be deducted from Sanford's gross revenues and no other costs of doing business.

evidence would "improper[ly] invit[e] . . . the jury to engage in rank speculation regarding 'motive.'"  *Id.* at 10.  Furthermore, Sanford argues that any motive argument is "plainly illogical" because the "allegations regarding the making of false entries in the ORB relate to an incidental aspect of the operation of the engine room of the *Nikunau*."  *Id.*

       1.   Monetary Proceeds Are Generally Relevant to Motive

Taking the motive argument first, Sanford relies extensively on the Third Circuit's decision in *United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006), which involved similar charges against a chief engineer for making false entries in the ORB to conceal illegal discharges of oily bilge water into the ocean.  *See* Def.'s Mem. at 10–11.  The similarity between the cases stops there, however.  The issue in *Abrogar* was whether the district court had properly applied a six-level sentencing enhancement, pursuant to § 2Q1.3 of the United States Sentencing Guidelines, for repeated discharges of pollutants into the environment.  *See Abrogar*, 459 F.3d at 431.  The district court had imposed the six-level enhancement—even though the defendant had been charged with ORB recordkeeping violations rather than actual illegal discharges—because it found that the illegal discharges were "relevant conduct" for purposes of determining the total offense level under the Guidelines.  *See id.* at 433; *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.1 cmt. 1(H) (2011) (defining "offense" as "the offense of conviction and all relevant conduct").  The Third Circuit disagreed, holding that improper discharges are not "relevant conduct" under the Sentencing Guidelines.  *Abrogar*, 459 F.3d at 435–36.

Sanford points to *Abrogar* and invites the Court to conflate the term "relevant conduct" under the U.S. Sentencing Guidelines ("USSG") § 1B1.3 with the term "relevant evidence" under FED. R. EVID. 401, but the Court declines that invitation.  Even though both terms use the nomenclature of relevance, the definitions and applications of those two terms are completely

different.  "Relevant evidence" is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action," FED. R. EVID. 401, while "relevant conduct" is "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," U.S. SENTENCING GUIDELINES MANUAL § 1B1.3.  In other words, "relevant conduct" may be "relevant evidence," but the converse is not necessarily true.  As *Abrogar* makes plain, not all relevant evidence is "relevant conduct" under the Guidelines.

The government, on the other hand, proffers that evidence of monetary proceeds is relevant to motive because Sanford paid its employees per metric ton of fish they caught at sea. Gov't Opp. Mem. at 4–5.  According to the government, this created an incentive for the crew to "primarily focus[] on fishing operations, keeping the fish properly refrigerated, and trying to maximize their catch," *id.* at 4, rather than spending time maintaining their ORB or running the OWS.  Furthermore, the government argues, because a vessel like the *San Nikunau* "can be prevented entry into a port of the United States and prevented from engaging in commerce if the vessel is not in compliance with international or United States law," *id.*, the crew had a motive to cover up the alleged violations so that they would not be barred from selling their fish at port and getting paid.

"'[M]otive is always relevant in a criminal case, even if it is not an element of the crime.'"  *United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011) (quoting *United States v. Sriyuth*, 98 F.3d 739, 747 n.12 (3d Cir. 1996)); *United States v. Day*, 591 F.2d 861, 874–75 (D.C. Cir. 1978) ("Motive is a state of mind . . . showing the probability of appropriate ensuing action

8

[and] it is always relevant." (quoting 1 Wigmore on Evidence § 118 at 558, 561 (3d ed. 1940))).

Although Sanford is correct that monetary proceeds are not an element of any offense charged,

the government has demonstrated that at least some evidence of monetary proceeds will be

relevant because it is probative of the incentives and priorities of the defendants and, thus, will

have a tendency to make it more or less probable that the defendants committed the charged

offenses.

        2.  <u>Evidence of Monetary Proceeds Is Generally Unlikely to Be Unfairly<br>Prejudicial</u>

Sanford next argues that even if evidence of monetary proceeds has probative value, that

value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and

misleading the jury. *See* Def.'s Mem. at 13–16. The Court disagrees. Although Sanford points

to several authorities in the context of civil litigation where parties were barred from admitting

evidence of a party's "financial condition or wealth," *see id.* at 14–15, the considerations are

different in a criminal case. To start, the government bears a much heavier burden of proof than

a civil plaintiff would. Also, although a "David versus Goliath" dynamic can sometimes lead

civil juries to impose liability out of sympathy for beleaguered plaintiffs in a legal dispute with

deep-pocketed defendants, such a dynamic is unlikely when the United States government is a

defendant's adversary.

Although Sanford expresses concern that admitting evidence of monetary proceeds will

"give the jury the false impression that the legitimate fishing and commercial activities of the

*Nikunau* constituted an illegal racketeering type enterprise," *id.* at 16, this concern is highly

speculative and unlikely. First, it will be no secret that Sanford is a commercial fishing

enterprise, which is in the business of making money from fishing, and not a criminal enterprise.

The government does not appear to contest this fact, and the Court has no reason to believe that

this will constitute even a subtext of the government's presentation at trial.  To the contrary, the government intends to offer evidence of monetary proceeds to show that the crewmembers of the *San Nikunua* had an incentive to catch and preserve for sale as many fish as possible and that this over-arching priority made APPS compliance a lesser concern.  *See* Gov't Opp. Mem. at 2–4. Second, the Court believes the jury is perfectly capable of discerning the clear difference between a commercial fishing enterprise and an "illegal racketeering type enterprise," particularly where the proffered monetary proceeds were explicitly gained from "the offload of fish cargo from the *F/V San Nikunau*."  Superseding Indictment at 3.

The Court finds that some evidence of monetary proceeds earned by Sanford from its commercial fishing activities on the *San Nikunau* during the relevant time period is generally relevant to the defendants' motives to commit the charged offenses and that such relevance is not substantially outweighed by a danger of unfair prejudice.  As a result, insofar as Sanford has moved to exclude *all* evidence of such monetary proceeds, that motion is DENIED.

### B. The Meaning of "Gross Gain" and "Derived From" Delimit the Relevance of Monetary Proceeds

Denying Sanford's general relevance objections is not the end of the matter, however. Although the Court finds that, in the main, evidence of monetary proceeds is admissible, the question remains whether admitting particular measures of monetary proceeds could be unfairly prejudicial to Sanford.  For the reasons discussed below, the Court holds that the government's proposed *specific* measure of monetary proceeds ($24,045,930.79 in gross revenues) may not be admitted, standing alone, to establish the "gross gain" that Sanford "derive[d] . . . from" the charged offenses under 18 U.S.C. § 3571(d).  The government may not admit that specific monetary figure except to the extent, and only if, necessary for the jury to establish or calculate

the appropriate measure of "gross gain" "derive[d] . . . from" the charged offense, which the Court defines below.

      1. *Southern Union* and 18 U.S.C. § 3571(d)

The Supreme Court recently held that "the rule of *Apprendi* applies to criminal fines." *S. Union Co. v. United States*, 132 S. Ct. 2344, 2357 (2012). This means that "'[o]ther than the fact of a prior conviction, any fact that increases" the amount of a criminal fine "beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.'" *Id.* at 2350 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). The majority in *Southern Union* considered but ultimately rejected the government's argument that "requiring juries to determine facts related to fines will cause confusion (because expert testimony might be needed to guide the inquiry); or prejudice the defendant (who might have to deny violating a statute while simultaneously arguing that any violation was minimal)."[3] *Id.* at 2356. Likewise, in dissent, Justice Breyer argued that applying *Apprendi* to criminal fines would be highly problematic because Congress, in enacting statutes like 18 U.S.C. § 3571(d) "expected judges, not juries, to determine fine-related sentencing facts because doing so will often involve highly complex determinations." *Id.* at 2370 (Breyer, J., dissenting). In fact, Justice Breyer argued that in "an environmental pollution case, the jury may have particular difficulty assessing different estimates of resulting losses," and that "the majority's holding will sometimes permit prosecutors

---

[3] Notably, Sanford makes this precise argument, contending that, should evidence of its alleged pecuniary gain from the sale of fish cargoes be admitted, "the defendant will be placed in the position of having to deny violating the statutes alleged in the criminal indictment while simultaneously arguing that any pecuniary gain from its violation of the statutes was minimal." Def.'s Reply Mem. at 5, ECF No. 156. For this reason, Sanford seeks bifurcation of the guilt phase of the trial from the penalty phase. The Court is not now prepared to bifurcate the trial since evidence of the defendants' monetary proceeds is relevant and probative evidence of their culpability. *See United States v. AU Optronics Corp.*, No. 09-00110, 2011 WL 2837418, at *5 (N.D. Cal. July 18, 2011) (denying government motion for bifurcation because "similar evidence will undoubtedly be introduced in order to prove defendants' guilt or innocence" after finding that issues related to alternative fine in criminal price-fixing case required submission to the jury).

to introduce newly relevant evidence that would otherwise have been kept from the jury on the ground that it was cumulative or unduly prejudicial."  *Id.*

In federal criminal cases, the government may seek two principal types of fines for organizational defendants.  The government may seek either (1) the statutorily prescribed maximum fine for the type of offense charged, which for a felony is $500,000 per offense, 18 U.S.C. § 3571(c)(3), or (2) an alternative fine, "[i]f any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant," that is "not more than the greater of twice the gross gain or twice the gross loss," *id.* § 3571(d).  Thus, the maximum statutorily prescribed fine that could be levied against Sanford should this defendant be convicted on all counts against it, is $3,500,000 (i.e., $500,000 times seven felony counts).

In this case, the government intends to "seek to have the jury find that [Sanford] gained [$24,045,930.79] as a result of the criminal charges."  Gov't Opp'n Mem. at 1 n.1.  As is clear from the Supreme Court's decision in *Southern Union* and 18 U.S.C. § 3571(d), however, in order for the Court to impose a fine in that amount against Sanford, the U.S. Constitution requires that the jury find beyond a reasonable doubt that this amount constituted a "gross gain" to Sanford and that this amount was "derive[d] . . . from" the charged offenses.  Therefore, even though Sanford's monetary proceeds are generally relevant to the defendants' motives, because the jury is constitutionally required to determine the amount of any fine exceeding $3,500,000, the Court holds that the probative value of any monetary proceeds evidence in this case is necessarily cabined by the definitions of "gross gain" and "derive[d] . . . from" as those terms are used in 18 U.S.C. § 3571(d).  This is primarily because, if the government is allowed to present the $24,045,930.79 gross revenues earned by Sanford as the appropriate measure of a criminal

fine under 18 U.S.C. § 3571(d), when, as a matter of law, the "gross gain" that was

"derive[d] . . . from" Sanford's crimes is a measure that is less than gross revenue, then Sanford

stands to be unfairly prejudiced by being punished with a fine that exceeds the bounds of

§ 3571(d).

Hence, although the government will be permitted to present evidence of Sanford's

monetary proceeds from commercial fishing on the *San Nikunau* between March 2007 and July

2011, it may not present evidence of the $24,045,930.79 gross revenue figure except to the

extent, and only if, necessary to establish or calculate the appropriate measure of "gross gain"

"derive[d] . . . from" the charged offense.  In other words, the government may not present

evidence of the $24,045,930.79 gross revenue figure in a vacuum for the purpose of establishing

"gross gain."  Context matters, and in order to avoid the danger of unfair prejudice presented by

this evidence, the government must provide to the jury sufficient context for the $24,045,930.79

figure—vis-à-vis the proper definitions of "gross gain" and "derive[d] . . . from" laid out

below—to admit it for the purpose of establishing or calculating "gross gain." [4]

2.   The Meaning of "Gross Gain"

The term "gross gain" is not defined anywhere in the Alternative Fines Act.  The phrase

appears ambiguous on its face because a "gross" monetary amount typically refers to "total

income from all sources before deductions, exemptions, or other tax reductions," as opposed to a

"net" monetary amount which would exclude costs and other deductions.  *See* BLACK'S LAW

DICTIONARY 831 (9th ed. 2006).  The word "gain," on the other hand, typically refers to the

---

[4] If, however, the government chooses not to pursue an alternative fine under 18 U.S.C. § 3571(d), or if the Court finds that the evidence required to prove "gross gain" would unduly delay or complicate the proceedings, the danger of unfair prejudice attached to the admission of the $24,045,930.79 figure would disappear.  Under either of these two scenarios, evidence of the $24,045,930.79 figure would be admissible at trial for the purpose of proving motive.

"excess of receipts over expenditures or of sale price over cost," i.e., profit or "net" income.  *See id.* at 747.[5]

### a.   *U.S. Sentencing Guidelines*

One source that illuminates the meaning of "gross gain" is the U.S. Sentencing Guidelines.  The Guidelines state that the base fine for an organizational defendant is the greatest of three figures, including "the pecuniary gain to the organization from the offense."  U.S. Sentencing Guidelines Manual § 8C2.4(a).  The Guidelines further define "pecuniary gain" as "the additional before-tax profit to the defendant resulting from the relevant conduct of the offense."  *Id.* § 8A1.2 cmt. 3(H).  This definition of "pecuniary gain" is helpful in determining the meaning of "gross gain" because, as the commentary makes clear, the Guidelines' use of the term "pecuniary gain" is "derived from 18 U.S.C § 3571(d)."  *Id.*[6]

### b.   *Legislative History*

When faced with an ambiguous statutory phrase, it also "becomes necessary for a court to look to the intent of Congress as revealed in the history and purposes of the statutory scheme."  *Penn Allegh Coal Co. v. Holland*, 183 F.3d 860, 864 (D.C. Cir. 1999) (internal quotation marks omitted); *see also Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'").

---

[5] *Compare* 6 Oxford English Dictionary 370 (2d ed. 1989) (defining "gross" as "[e]ntire, total, whole.  Now only (opposed to *net*) of an amount, value, weight, number, or the like, before necessary deductions have been made"), *with id.* at 311 (defining "gain" as "[s]ums acquired by trade or in other ways; emoluments, profits, winnings, etc.").

[6] The environmental crimes charged against Sanford as the causes of its alleged $24,045,930.79 pecuniary gain are exempt from the Sentencing Guidelines' provisions regarding the sentencing of organizational defendants.  *See* U.S. Sentencing Guidelines Manual § 8C2.1.  Instead, the Guidelines state that courts should determine the appropriate fine against organizational defendants for such environmental crimes "based on the  general statutory provisions governing sentencing," which in this case would be 18 U.S.C. § 3571.  *Id.* § 8C2.10 cmt. background.

In the case of 18 U.S.C. § 3571(d), it is necessary first to consult its predecessor statute, 18 U.S.C. §3623(c)(1) (repealed 1987), which contains the identical "gross gain" language as 18 U.S.C. §3571(d).  The language of the House Judiciary Committee Report accompanying that statute suggests that Congress intended the "gross gain" language to refer to the net proceeds or profits derived from an offense.  *See* H.R. REP NO. 98-906 at 17 (1984) ("[The alternative fines] provision is intended to enable federal courts to impose fines that will prevent convicted offenders from *profiting from their wrongdoing*." (emphasis added)).  The language of the House Judiciary Committee Report accompanying 18 U.S.C § 3571(d)—written when the law was amended three years later—echoes the same concern with profiting or benefiting from an offense, which is consistent with the term "gain" and the more precise phrase "pecuniary gain" that is used throughout the report.  *See* H.R. REP. NO. 100-390 at 6 (1987) (amending the statute so that "if the defendant knows or intends that his conduct will *benefit another person financially*, the court can measure the fine imposed based on twice that *benefit*" (emphasis added)).

The language from 18 U.S.C. § 3623(c)(1) (repealed) was in turn derived from the Model Penal Code, which states that "[a] person who is convicted of an offense may be sentenced to pay a fine not exceeding . . . any higher amount equal to double the pecuniary gain derived from the offense by the offender."  MODEL PENAL CODE § 6.03(5) (1981); *see also* H.R. REP. NO. 98-906 at 17.  The drafters' comments accompanying the Model Penal Code likewise use the terminology of "profit" in describing the measure of "pecuniary gain" for purposes of this type of criminal fine:

> In cases where the defendant has gained from his offense, the imposition of a sanction that has the dual purpose of removing the profit and removing the incentive to seek profit in this manner seems justified.  Subsection (5) accordingly

permits the fine to be measured in such cases by double the pecuniary gain derived from the offense by the offender.

3 MODEL PENAL CODE AND COMMENTARIES § 6.03 comment 2, at 61–62 (1985).

c. *Judicial Interpretation*

Few courts have interpreted the proper meaning of the term "gross gain" in 18 U.S.C. § 3571(d), and among those courts that have considered this issue, there is a difference of opinion as to whether it includes only "net" gains, i.e., profits, whether it includes all revenues derived from an offense without deducting costs and taxes, or whether some other measure may be appropriate in certain circumstances.

Some district courts have viewed "gross gain" to mean gross revenues derived from a crime or criminal enterprise rather than profits. For example, in *United States v. Bader*, the District of Colorado held that because "the jury concluded that [the defendant] grossed $4.8 million in revenue from the sale of the unlawfully-imported human growth hormone . . . the maximum fine that may be imposed against [the defendant] under 18 U.S.C. § 3571(d) is $9.6 million." No. 07-cr-00338, 2010 WL 2681707 at *2 (D. Colo. July 1, 2010). The District of Kansas drew a similar conclusion, holding that, in a counterfeit goods case, "gross gain" meant "the amount of the bank deposits attributed to [the defendant's] sale of infringing merchandise." *United States v. Foote*, CR.A. 00-20091-01, 2003 WL 22466158, at *7 (D. Kan. July 31, 2003).

Other courts have viewed the matter differently. Notably, the court in *SEC v. Bilzerian*— which appears to be the only decision from within this Circuit to address the definition of "gross gain"—stated that "§ 3571(d) provides a calculation for the potential allowable fine *based upon the amount of illicit profit*." 814 F. Supp. 116, 120 (D.D.C. 1993) (emphasis added); *see also United States v. McNair*, 605 F.3d 1152, 1217, 1224 (11th Cir. 2010) (noting presentence investigation reports defined "gross gain" as the defendant's "net profit or benefit . . . in

connection with their [crimes]"); *United States v. Wilder*, 15 F.3d 1292, 1301 (5th Cir. 1994) (affirming district court's fine of $4 million under § 3571(d) where "the record adequately demonstrate[d] that [defendant] received *gross profits* of over two million dollars from the scheme to defraud" (emphasis added)).

At least one court, however, approved of a definition of "gross gain" that was neither gross revenue nor gross profit.  In *United States v. BP Products North America, Inc.*, the Southern District of Texas was asked to accept a plea agreement between the government and the defendant arising from a criminal Clean Air Act violation that had caused an oil refinery explosion, killing 15 and injuring at least 170 workers.  610 F. Supp. 2d 655, 660 (S.D. Tex. 2009).  The government argued that the criminal fine should be $50 million, which represented twice the amount of the defendant's cost savings from not replacing a chimney-like apparatus in the plant that "had been in poor operating condition" and whose faulty ventilation was believed to be the principal cause of the explosion.  *See id.* at 665, 695–96.

The victims argued, however, that the fine should be much higher.  They argued that "gross gain" should be defined as, among other possible measures, all of the plant's profits from either the fourteen months or the six years prior to the explosion, which amounted to either $450 million or $1 billion respectively.  *Id.* at 699.  The government argued that the plant's profits were the wrong measure of "gross gain," taking the position that defining "gross gain" as the plant's profits "would so unduly complicate a sentencing determination that the complexity provision of § 3571(d) would apply."  *Id.* at 701.  The Court agreed, noting that such a measure of "gross gain" "would require the court to determine what part of these profits were either costs saved or additional revenues generated by the failure to implement the process safety measures that are the basis of the offense."  *Id.* at 699.  Ultimately, the court adopted the government's

position and approved the criminal fine of $50 million in the plea agreement as "a reasonable estimate of the gross pecuniary gain that [the defendant] derived from the criminal offense." *Id.* at 728.

The authorities interpreting "gross gain" generally as profits rather than revenues, *see Bilzerian*, 814 F. Supp. at 120; *see also McNair* 605 F.3d at 1217, 1224*; Wilder* 15 F.3d at 1301, appear to comport with the definition of "pecuniary gain" in the U.S. Sentencing Guidelines, the natural equivalence of "gain" with "profit," and with Congress's stated intent to have § 3571(d) "prevent convicted offenders from profiting from their wrongdoing," H.R. REP NO. 98-906 at 17. Therefore, the Court concludes that the term "gross gain" means any additional before-tax profit to the defendant that derives from the relevant conduct of the offense.

### 3.  The Meaning of "Derived From"

An additional question related to the proper measure of "gross gain" is the meaning of the term "derive[d] . . .from" in § 3571(d).  This issue presents the question of what causal nexus is required between a monetary amount and a charged offense to allow the monetary amount to qualify as a "gross gain" that was "derive[d] . . . from" the offense.

Once again, the statute does not define the term "derive[d] . . . from," and so resort to other sources is required.  "It is a bedrock rule of both tort and criminal law that a defendant is only liable for harms he proximately caused."  *United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011) (footnoted omitted) (collecting sources); *see also United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir. 1986) ("A basic tenet of criminal law is that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury."); *BP Products*, 610 F. Supp. 2d at 688–89 (construing "derived from" language in § 3571(d) "as imposing a proximate causation requirement").

18

The only case to address the precise question of the causal nexus required under § 3571(d) is the Southern District of Texas's decision in *BP Products*.  In that case, the victims argued that "derive[d] . . . from" entails a but-for causation standard.  They argued that if Congress had intended to mandate a stricter proximate causation standard, it would have expressly used such language as it does in other statutes governing criminal restitution and the Crime Victims' Rights Act ("CVRA").  610 F. Supp. 2d at 687–88; *see also* 18 U.S.C. § 3663(a)(2) (permitting restitution for victims "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"); 18 U.S.C. § 3663A(a)(2) (requiring restitution for victims of certain crimes who were "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"); 18 U.S.C. § 3771(e) (extending protections to victims "directly and proximately harmed as a result of the commission of a Federal offense").  By contrast to the CVRA and criminal restitution statutes, no proximate cause standard is expressly required in § 3571(d).

The court in *BP Products* disagreed with the victims and, instead, was persuaded by the government and the defendant who argued that the common-law principles of causation "mandate that gain or loss be both factually and proximately caused by the defendant's acts." *BP Products*, 610 F. Supp. 2d at 688 (internal quotation mark omitted).  The court relied upon a series of decisions from other courts that had addressed the appropriate causation standard for criminal penalties and concluded that a proximate causation standard was required.  *See id.* (collecting cases).  In particular, the court discussed *United States v. Spinney*, which had interpreted the predecessor statute, 18 U.S.C. § 3623, and had concluded that "'[c]ausation in criminal law has two requirements:  cause in fact and proximate cause.'"  *Id.* (quoting 795 F.2d at 1415).  The *BP Products* court further concluded that a proximate causation standard would be

consistent with the Supreme Court's decision in *Hughey v. United States*, 495 U.S. 411 (1990),

"in which the Court concluded that a defendant could be ordered to pay restitution only for

damages caused by the 'offense of conviction,' to the exclusion of other 'losses stemming from

all conduct attributable to the defendant, including conduct unrelated to the offense of

conviction.'" *Id.* (quoting 495 U.S. at 418).

      In addition to strenuously arguing that proximate cause was the appropriate standard to

apply to § 3571(d), it should also be noted that, in *BP Products*, the government went one step

further by taking the position that, absent its plea agreement, it "would have a difficult time at

trial establishing the necessary causal links among [the defendant's] charged criminal conduct,

liability for the explosion, and the victims' losses or [the defendant's] gain." *Id.*  Indeed, the

government's position was that the proximate cause standard, aside from being the correct

interpretation of the statute, would be so demanding and complex when seeking a fine against an

organizational defendant for an environmental crime under 18 U.S.C. § 3571(d) that "showing

the necessary causal link . . . would require 'methodically and carefully structure[d]' and highly

technical proof." *Id.* at 689.

      The Court finds the reasoning of *BP Products* persuasive and concludes that the term

"derive[d] . . . from" requires that the government prove that a given monetary amount (either a

gain or a loss) was proximately caused by the conduct of the charged offense in order to qualify

as a "gross gain" under § 3571(d).  Based on its litigating position in *BP Products*, the Court has

little doubt that the government concurs that proximate cause is the appropriate standard under

§ 3571(d).  The Court is cognizant that how demanding this standard may be when seeking fines

against organizational defendants for environmental crimes depends upon the nature of the

charges and underlying criminal conduct.  This is a threshold issue requiring attention before application of the alternative fine provision of § 3571(d).

### C.  Undue Complication

If the imposition of the "gross gain" measure of a criminal fine would "unduly complicate or prolong the sentencing process," the alternative measure becomes unavailable and the statutory maximum of $500,000 per offense applies instead.  *See* 18 U.S.C. § 3571(d) ("[T]he defendant may be fined [under this subsection] . . . unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process."); *BP Products*, 610 F. Supp. 2d at 682 ("Under § 3571(d), if imposing the alternative maximum fine would 'unduly complicate or prolong the sentencing process,' the $500,000 maximum applies.").  The alternative fine provision refers to delay and complexity in "the sentencing process," but in the wake of the *Southern Union* decision, the Court must consider these factors in determining the admissibility at trial of evidence pertaining to gross gain. *See* FED. R. EVID. 403 (relevant evidence may be excluded if probative value is substantially outweighed by a danger of "confusing the issues," or "undue delay").

Once again, the *BP Products* case is instructive, not only regarding the appropriate interpretation of § 3571(d), but also regarding the myriad practical complexities that can arise in proving a "gross gain" to an organizational defendant in an environmental crime case.  As that court noted with respect to the "unduly complicate and prolong" language, the House Report from the predecessor statute, § 3623(c), discussed the circumstances in which calculating an alternative fine might be inappropriate:

> [F]or example, if determining the amount of the defendant's gain were to require a protracted hearing that would last longer than the trial, the judge could decline to base the fine on the defendant's gain. The court's determination as to whether imposing a fine based on defendant's gain or

> victim's loss is discretionary, and the committee is confident that federal
> judges will not abuse this discretion.

H.R. REP. NO. 98-906 at 17.  The court also cited to similar statutory sections that provided

useful guidance on the threshold for when an alternative fine determination "unduly

complicate[s] or prolong[s] the sentencing process."  *See BP Products*, 610 F. Supp. 2d at 690–

91 (citing and discussing The Victim and Witness Protection Act, 18 U.S.C. § 3663(a)(1)(B)(ii)

and The Mandatory Victims' Restitution Act, 18 U.S.C. § 3663A(c)(3)(B)).  Ultimately, the

court held that, in determining whether a "gross gain" determination would meet the threshold, it

should consider three factors:  (1) whether there are multiple victims; (2) whether the causation

issues are disputed; and (3) whether disputed future losses are involved.  *Id.* at 691.

In this case, although there are no identifiable "victims" or any future losses at issue, the

parties do contest what portion of Sanford's profits earned from the fishing voyages at issue were

gained as a proximate result of the offenses.  *See* Tr. of Pre-trial Conference at 31:23–32:15 (July

9, 2012) (unofficial rough transcript); *see also* Def.'s Reply Mem. at 8 n. 4 ("[T]he Superseding

Indictment failed to allege any facts establishing *a causal connection* between the proceeds

obtained by Sanford for the offload of fish cargo from the *F/V San Nikunau* and the criminal

charges contained in the Superseding Indictment.").  The government made clear its plan to

present evidence on gross gain "through one witness—a custodian of records from TriMarine

Singapore . . . . [who] will testify that according to the records of TriMarine Singapore, from

March 2007 through July 2011, an amount of approximately $24,045,930.79 USD was paid to

Sanford Ltd. for tuna offloads in Pago Pago, American Samoa."  Gov't Opp'n Mem. at 3-4.

Sanford, on the other hand, argues that "evidence regarding Sanford's overall commercial

purposes and the proceeds from offloading of fish cargoes from the *F/V San Nikunau* bear no

relation to the record-keeping offenses charged in the Superseding Indictment."  Def.'s Reply

Mem. at 6–7.  The defendants represented to the Court at the Pre-trial Conference on July 9,

2012, that they would seek to present evidence through two or three witnesses with respect to the

"gross gain" issue.  *See* Tr. of Pre-trial Conference at 39:9–21(unofficial rough transcript).  Both

parties made these representations, however, prior to the Court's instant ruling on the definitions

of "gross gain" and "derive[d] . . . from" under § 3571(d).

The Court requires additional information before deciding whether allowing the

government to seek a fine under § 3571(d) would "unduly complicate or prolong" the trial.[7]

Therefore, the government is directed to submit, on or before noon on July 24, 2012, notice of

the number of witnesses and kinds of evidence it intends to present to the jury regarding the

"gross gain" that Sanford "derive[d] . . . from" the charged offenses.  If Sanford wishes to submit

a response, it must do so on or before noon on July 26, 2012.  The parties are reminded that, in

light of the Court's rulings in this opinion, in order to qualify as "gross gain" that is

"derive[d] . . . from" the charged offenses, it will be the government's burden to prove to the jury

beyond a reasonable doubt that any before-tax profits earned by Sanford were earned as a

*proximate* result of the charged offenses.

## III.    <u>CONCLUSION</u>

For the reasons explained above, the Court finds that evidence of monetary proceeds is

generally relevant to motive in this case, and that the danger of unfair prejudice is unlikely to

result from the admission of such evidence.  As a result, Sanford's motion to exclude such

evidence, ECF No. 143, is DENIED.

---

[7] To be clear, as noted previously, at note 4 *supra*, should the Court determine that the evidence pertinent to the alternative fine computation would unduly complicate or prolong the trial, warranting exclusion of evidence relating to the gross gain derived by Sanford from the charged offenses under Fed. R. Evid. 403, the government would then be permitted to admit evidence of Sanford's $24, 045, 930.79 in gross revenues as probative of the defendants' motive, without risk that this evidence would unduly prejudice the jury in determining Sanford's "gross gain."

The Court further holds that the government may only introduce evidence of monetary proceeds in support of an alternative fine under 18 U.S.C. § 3571(d) to the extent, and only if, such evidence is necessary to establish or calculate the appropriate measure of "gross gain" "derive[d] . . . from" the charged offense, namely:  monetary proceeds which are additional before-tax profit to the defendants that was proximately caused by the relevant conduct of the offense.

Finally, the Court reserves judgment at this time on the question of whether allowing the government to introduce evidence in support of an alternative fine under 18 U.S.C. § 3571(d) would "unduly complicate or prolong," the trial, pending the government's submission, on or before noon on July 24, 2012, regarding the number of witnesses and kinds of evidence to be offered in support of the "gross gain" to Sanford that was "derive[d] . . . from" the charged offenses.

An Order consistent with this Memorandum Opinion shall be entered.

Date:  July 19, 2012

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge