**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Case No. 11-352 (BAH) |
| SANFORD LTD. | |
| JAMES POGUE, | Judge Beryl A. Howell |
| Defendants. | |

**MEMORANDUM OPINION**

This case comes before the Court because the government and the defendants (a commercial fishing company and its employee) disagree about the appropriate jury instructions to be given regarding five counts of a superseding indictment charging the defendants with violations of a criminal marine pollution statute and associated criminal laws.  The five counts at issue charge the defendants with conspiring to knowingly fail to maintain an accurate Oil Record Book in violation of 18 U.S.C. § 371; knowingly failing to maintain an accurate Oil Record Book in violation of 33 U.S.C. § 1908(a), 18 U.S.C. § 2, and 33 C.F.R. § 151.25; and knowingly making false, fictitious, and misleading entries in the Oil Record Book in violation of 18 U.S.C. §§ 2 and 1519.  *See* Superseding Indictment at 7–16, ECF No. 22

The disagreement between the parties ostensibly relates to how the Court should instruct the jury with regard to the geographic scope of the application of United States law.  More particularly, the disagreement stems from the parties' differing views on precisely what conduct the government is prosecuting as a crime and whether that conduct should be governed by United States law or the law of New Zealand.  For the reasons discussed below, the Court believes not only that the defendants had a legal duty to record certain events in their Oil Record

1

Book, but also that this duty arises under United States law, and therefore that it is both appropriate and fair to prosecute the defendants for their failure to record such events.

## I.    BACKGROUND

This case arises out of the defendants' commercial fishing operations in the South Pacific.  Defendant Sanford Ltd. ("Sanford"), a New Zealand corporation, owned and operated the *F/V San Nikunau*— a purse-seine tuna vessel—and, for portions of 2007 to 2010, Defendant James Pogue was the Chief Engineer of the *San Nikunau*.  Superseding Indictment at 2–3.  The *San Nikunau* was registered under the flag administration of New Zealand, but it transported its fish cargoes to United States ports, including Pago Pago, American Samoa, on a regular basis. *Id.*  In fact, the government charges that Sanford earned over $24 million in gross revenues from fish cargoes offloaded in American Samoa during the relevant time period.  *Id.* at 3.

The *San Nikunau* and nearly every other commercial seafaring vessel are subject to marine pollution regulations.  The relevant legal framework for the obligations arising under these regulations—and the crimes charged in this case—begins with two international marine pollution treaties:  the 1973 International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, 1340 U.N.T.S. 184, and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, Feb. 17, 1978, 94 Stat. 2297, 1340 U.N.T.S. 61.  Together, these treaties are known as "MARPOL," to which there are 150 signatories, including the United States and New Zealand.  Because MARPOL is not self-executing, each signatory nation must enact domestic legislation implementing MARPOL's provisions.  *See* MARPOL art. 1(1), 1340 U.N.T.S. 63.  The United States implemented MARPOL through the Act to Prevent Pollution from Ships ("APPS").  *See* Pub. L. No. 96-478, 94 Stat. 2297 (1980) (codified as amended at 33 U.S.C. §§ 1901–1915).

2

Under the APPS, it is a crime to "knowingly violate the MARPOL Protocol . . . [the APPS], or the regulations issued thereunder." 33 U.S.C. § 1908(a). In turn, the United States Coast Guard has promulgated regulations under the authority of the APPS, which are located at 33 C.F.R. Part 151, Subpart A. In relevant part, the Coast Guard regulations require ships like the *San Nikunau* to maintain an Oil Record Book ("ORB"). *See* 33 C.F.R. § 151.25(a). These regulations also require that:

> Entries shall be made in the Oil Record Book on each occasion, on a tank to tank basis if appropriate, whenever any of the following machinery space operations take place on any ship to which this section applies—
>
> (1) Ballasting or cleaning of fuel oil tanks;
>
> (2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil tanks;
>
> (3) Disposal of oil residue; and
>
> (4) Discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces.

*Id.* § 151.25(d). Furthermore, any entry in the ORB that records a "discharge of oil or oily mixtures into the sea from a ship . . . or from machinery space bilges" must also record whether "[t]he ship has in operation oily-water separating equipment." *See id.* § 151.10.[1] If the Coast Guard determines that a vessel is not in compliance with any provision of MARPOL, the APPS, or the regulations promulgated thereunder (including § 151.25), it may deny the ship entry into United States ports or offshore terminals, *see* 33 U.S.C. § 1228; 33 C.F.R. § 151.07(b), or it may detain the ship in port until it is safe for the vessel to proceed to sea, *see* 33 C.F.R. § 151.23(b).

In this case, the Superseding Indictment charges the defendants with two types of ORB violations: (1) affirmatively false ORB entries; and (2) failures to make entries in the ORB that

---

[1] A certification that oily-water separating equipment was running at the time of a discharge of an oily mixture from a machinery space is an implied requirement for any ORB entry relating to such a discharge because it is illegal for a ship to discharge an oily mixture from a machinery space without having oily-water separating equipment in operation. *See* 33 C.F.R. § 151.10.

are required to be made under § 151.25.  The charged affirmatively false entries were ORB

entries that "falsely stated the Oil Water Separator was used when in fact it was not" or,

similarly, "falsely stat[ed] that required pollution prevention equipment had been used when it

had not."  *See* Superseding Indictment at 13–16.  The charged omissions were failures to record

discharges of oily bilge water from certain spaces on the vessel (such as the bow thruster space

and ammonia compressor room), as well as intra-vessel tank-to-tank transfers of oil or oily bilge

water.  *See id.* at 9–10, 13–16.[2]

This distinction between affirmatively false entries and omissions is the root of the true

dispute regarding the jury instructions.  All parties agree that affirmatively false entries in the

ORB, if proven, would constitute violations of the APPS.[3]  The defendants protest, however, that

a violation premised on an omission necessarily reaches a failure to act *on the high seas*, where a

vessel's conduct is governed by the laws of its flag State (in this case New Zealand).  Thus, the

defendants would like to make it clear in the APPS instructions to the jury that the relevant Coast

Guard regulations "apply to vessels operated under the authority of other nations *only* when they

are present within the navigable waters, ports, or terminals of the United States."  *See* Pre-Trial

Mem. Regarding the Proposed Jury Instructions on the Act to Prevent Pollution from Ships

("Defs.' Mem.") at 10, ECF No. 169.  Additionally, in conformity with the defendants'

construction of New Zealand MARPOL regulations, the defendants seek to limit the definitions

and record-keeping requirements of 33 C.F.R. § 151.25 to apply only "with respect to engine

---

[2] *See also* Gov't's Resp. in Opp'n to Defs.' Mot. to Dismiss Counts Two and Four of the Indictment, and for the Same Reasons, to Dismiss Count One of the Indictment at 10–11, ECF No. 95; Gov't's Resp. to Defs.' Mot. for Produc. of the Legal Instructions Provided to the Grand Jury with Respect to the Superseding Indictment, or in the Alternative, for an *In Camera* Review of the Legal Instructions at 5, ECF No. 81.

[3] *See* Tr. of Hearing at 6:17–21 (July 25, 2012) (unofficial rough transcript).

room operations that occurred aboard the *F/V San Nikunau* while it was present within the navigable waters, ports, or terminals of the United States." *Id.* at 10–11.

The government, however, maintains that such additions are improper because they would require the oily bilge water discharges to have taken place in United States navigable waters, ports, or terminals in order for the accompanying omissions from the ORB to constitute a violation of United States law. *See* Pre-Trial Mem. Opposing Defendants' Proposed Amendments to the Jury Instructions on the Act to Prevent Pollution from Ships ("Gov't Mem.") at 1, ECF No. 172.  According to the government, this is not the law.  Rather, the government argues that it is a violation of the APPS to maintain an ORB in a United States port when that ORB fails to contain entries for machinery space operations that (a) occurred on the high seas, but, nevertheless, (b) are required by United States law to be recorded in the ORB. *See id.* at 7. This is so, they argue, because an APPS ORB violation is completed "when the jurisdictional elements of the offense are present—*i.e.,* when the ship is in United States ports or waters," which is the case "even if all of the false entries or omissions relate to events that took place on the high seas."  Reply to Defs.' Pre-Trial Mem. Regarding the Proposed Jury Instructions on the Act to Prevent Pollution from Ships ("Gov't Reply") at 2, ECF No. 181.

The reason that the defendants seek these modifications is two-fold.  First, in the defendants' view, the MARPOL regulations enacted by New Zealand materially differ from the APPS and Coast Guard regulations, such that the defendants' conduct on the high seas fully complied with New Zealand law even if it did not comply with United States law. *See* Reply to Gov't's Pre-Trial Mem. Opposing Defendants' Proposed Amendments to the Jury Instructions on the Act to Prevent Pollution from Ships ("Defs.' Reply") at 4, ECF No. 180.  Second, the defendants further argue that, because New Zealand law applied to their conduct on the high

seas, the government cannot prosecute them for that conduct because the Superseding Indictment

fails to reference New Zealand law. *See id.* at 3. The government's response is also two-fold.

First, the government says that it is relying solely on United States law, not New Zealand law,

because regardless of where the omissions from the ORB were made, it is still a violation of

United States law to maintain an inaccurate ORB in a United States port. *See* Gov't Reply at 1–

3. Second, the government argues, by citation to New Zealand MARPOL regulations, that any

claimed conflict between New Zealand and United States law in this area is "non-existent" in

any event. *See* Gov't Mem. at 1, 4–6.

Although the parties only began briefing the Court on these issues nine days ago, *see*

Defs.' Mem. (filed July 18, 2012), continued to submit briefing on these issues up until two days

ago, *see* Gov't Reply (filed July 25, 2012), and likewise presented oral argument on this issue

two days ago, the fact remains that we stand on the eve of trial, which is set to begin in only

three days. Therefore, the Court feels the need to decide this question post haste, since an issue

as fundamental as the law that applied to the defendants' conduct is one that is sure to shape the

presentations of both sides' cases at trial.

## II.    DISCUSSION

This case presents the question of whether the United States government may criminally

prosecute a foreign-flagged vessel, under United States law, for failing to record conduct that

took place outside the jurisdiction of the United States, and which the vessel may have had no

obligation to record under its flag State's law. According to the defendants, this is a "question of

first impression."[4] Defs.' Mem. at 7. To answer this question, the Court must consider a number

---

[4] The defendants frame the question as follows: "whether a foreign-flagged vessel that maintains an ORB while on the high seas that is compliant with its flag State, can be prosecuted by the by the U.S. government under APPS for allegedly inaccurate ORB entries made in international waters." Defs.' Mem. at 7; *see also id.* at 12 (arguing that this case concerns "whether a violation of APPS may arise with respect to ORB entries made (or not made) in

of interrelated principles of maritime, international, and criminal law, and ultimately the Court

finds that the answer to this question is yes.

### A.     Where Do ORB Omission Violations Take Place?

When Congress enacted the APPS, it placed two express limitations on the scope of its

enforcement.  First, the APPS statute states that "[a]ny action taken under [Chapter 33] shall be

taken in accordance with international law."  33 U.S.C. § 1912.  Second, the statute makes clear

that the APPS and its regulations apply only to foreign-flagged vessels "while in the navigable

waters of the United States."  33 U.S.C. § 1902(a)(2); *see* 33 C.F.R. § 151.09(a) (Coast Guard

regulations under APPS "apply to each ship that . . . [i]s operated under the authority of a

country other than the United States and while in the navigable waters of the United States, or

while at a port or terminal under the jurisdiction of the United States").

Although "Congress has the *authority* to enforce its laws beyond the territorial

boundaries of the United States," whether Congress has in fact *exercised* that authority "is a

matter of statutory interpretation."  *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)

(emphasis added).  The statutory language noted above plainly reveals that Congress did not

intend to exercise its authority to apply APPS extraterritorially, particularly considering that

"'Congress legislates against the backdrop of the presumption against extraterritoriality.'"

*Pasquantino v. United States*, 544 U.S. 349, 373 (2005) (Ginsburg, J., dissenting) (quoting

*Arabian American*, 499 U.S. at 248); *see also United States v. Delgado-Garcia*, 374 F.3d 1337,

1344 (D.C. Cir. 2004) ("[W]e presumptively read the text of congressional statutes not to apply

extraterritorially, unless there are contextual reasons for reading the text otherwise.").

---

compliance with the laws, regulations, practices, and/or procedures of the vessel's flag State, even when those same
ORB entries or lack thereof may be considered 'inaccurate' under U.S. law").

The D.C. Circuit in *Delgado-Garcia* held that courts should "consider contextual and textual evidence" in determining whether Congress intended a statute to apply extraterritorially. Heeding this principle, the Court finds that not only does the textual evidence in the APPS clearly militate against extraterritorial application, but the contextual evidence does as well.  The APPS is a domestic enactment of a multilateral—indeed, global—marine pollution treaty.  In such a context, it would be highly unusual for Congress to intend to violate the inherent cooperative and reciprocal structure of MARPOL by invading the province of other sovereign signatories to enforce their own domestic implementations of the treaties.  *See Sale v. Haitan Ctrs. Council, Inc.*, 509 U.S. 155, 183 (1993) ("[A] treaty cannot impose uncontemplated extraterritorial obligations on those who ratify it through no more than its general humanitarian intent.").  Indeed, the APPS itself provides textual support for this contextual reality.  *See* 33 U.S.C. § 1908(f) ("[I]f the violation is by a ship registered in or of the nationality of a country party to the MARPOL Protocol . . . the Secretary . . .  may refer the matter to the government of the country of the ship's registry or nationality . . . rather than taking the actions required or authorized by this section.").

Whether or not the APPS applies extraterritorially, however, does not answer the question of whether the defendants in this case may be prosecuted for omissions that took place on the high seas.  This is because the APPS requires not only that vessels make all required *entries* in their ORBs, but also that vessels "*maintain* an Oil Record Book."  33 C.F.R. § 151.25(a) (emphasis added).  As the Second Circuit has held, "[i]n the context of a regulation imposing record-keeping requirements, the duty to 'maintain' plainly means a duty to maintain a reasonably *complete* and *accurate* record."  *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009).  Therefore, the APPS obligates vessels to "ensure that their ORBs are accurate

8

(or at least not knowingly inaccurate) *upon entering* the ports of navigable waters of the United States." *Id.* (emphasis added); *accord United States v. Jho*, 534 F.3d 398, 403 (5th Cir. 2008). Hence, the gravamen of an APPS ORB violation is "not the pollution itself, or even the Oil Record Book violation occurring [on the high seas], but the *misrepresentation* in port." *Jho*, 534 F.3d at 404 (emphasis added) (internal quotation marks omitted).  The Court agrees with the Fifth and Second Circuit's interpretation of the APPS and holds that an APPS ORB violation under 33 C.F.R. § 151.25 takes place at the moment a vessel enters a U.S. port with an inaccurate ORB.

### B.     What Is the Source of the Legal Duty to Record on the High Seas?

Having concluded that the defendants can clearly be prosecuted for maintaining an inaccurate ORB while in United States navigable waters or ports, the Court must also determine how the words "inaccurate" and "maintain" should be defined in this context.  In other words: Which jurisdiction's law governs whether an ORB is "accurate" when a vessel enters a United States port?  And, relatedly, what is the scope of a vessel's obligation to "maintain" an ORB when it travels among jurisdictions with varying interpretations of ORB obligations under MARPOL?  These are the most difficult questions the Court must consider.  At bottom, these questions require the Court to determine what substantive law governs a vessel's duty to make recordings in its ORB while on the high seas and what defines the scope of that duty.

As an initial matter, it is clear from Article 4 of MARPOL that the United States shares concurrent jurisdiction with a vessel's flag State over MARPOL violations occurring on foreign-flagged ships in United States ports.  *See* MARPOL art. 4, 1340 U.N.T.S. 185–86; *United States v. Pena*, -- F.3d --, No. 10-15928, 2012 WL 2327650, at *6 (June 20, 2012).  When the conduct at issue is an omission, however, the existence and nature of an underlying legal duty must be

examined to determine whether the omission was indeed a violation of the law in the first place. "It is a long-established principle that criminal law generally regulates action, rather than omission, and that '[f]or criminal liability to be based upon a failure to act it must first be found that there is a duty to act—a legal duty and not simply a moral duty.'" *United States v. Sabhnani*, 599 F.3d 215, 237 (2d Cir. 2010) (quoting 1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.2 (2d ed. 2008)).

The defendants argue essentially that any legal duties they had while on the high seas were solely those arising under New Zealand law.  *See* Defs.' Mem. at 3 (arguing that New Zealand law "define[s] the obligations for proper ORB maintenance aboard the *Nikunau* while the vessel operated on the high seas").  This argument is presumably premised upon the "law of the flag" doctrine, which states generally that "a merchant ship is a part of the territory of the country whose flag she flies." *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123 (1923).  This doctrine, however, "is a figure of speech, a metaphor," and the jurisdiction it describes "partakes more of the characteristics of personal rather than territorial sovereignty." *Id.*  In other words, the law-of-the-flag doctrine does not *literally* mean that a ship constitutes an extension of its flag State's territorial sovereignty, but rather it serves as a tiebreaker of sorts for areas of the world (e.g., the high seas) where there is no territorial sovereign. *Id.* ("[The law-of-the-flag doctrine] is chiefly applicable on the high seas, where there is no territorial sovereign; and as respects ships in foreign territorial waters it has little application beyond what is affirmatively or tacitly permitted by the local sovereign.").

In this, it is clear that the defendants are at least partially correct.  Because the Court holds that the APPS does not apply extraterritorially, the law that would apply to the conduct of the *San Nikunau* on the high seas is that of New Zealand.  To say that New Zealand law applied

to conduct aboard the *San Nikunau*, however, is not necessarily to say that New Zealand law was the exclusive source of the *San Nikunau*'s legal obligations.  *See Jho*, 534 F.3d at 406 ("The law of the flag doctrine does not mandate that *anything* that occurs aboard a ship *must* be handled by the flag state.").[5]  This is because, as the Supreme Court stated nearly 90 years ago:

> The merchant ship of one country voluntarily entering the territorial limits of another country subjects herself to the jurisdiction of the latter.  The jurisdiction attaches in virtue of her presence, just as with other objects within those limits.  During her stay she is entitled to the protection of the laws of that place and correlatively is bound to yield obedience to them.

*Cunard*, 262 U.S. at 124.  Hence, when a foreign-flagged merchant vessel chooses, out of commercial purpose, to call on United States ports, a *quid pro quo* takes place:  The ship agrees to put its operations into conformity with United States law, and in exchange the United States allows it to call on the port and do business there.  Indeed, if the ship does not comply, the United States may bar the ship from port, depriving it of access to the lucrative American market.  *See* 33 U.S.C. § 1228; 33 C.F.R. § 151.07(b).  The Supreme Court has long recognized this principle.  *See Patterson v. Eudora*, 190 U.S. 169, 178 (1903) ("[T]he implied consent to permit [foreign merchant vessels] to enter our harbors may be withdrawn, and if this implied consent may be wholly withdrawn, it may be extended upon such terms and conditions as the government sees fit to impose.").

---

[5] At oral argument relating to this issue, the government represented that the issue of applying United States law to ORB omissions on the high seas was addressed in both the *Ionia Management* and *Jho* decisions.  *See* Tr. of Hearing at 15:3–11 (July 25, 2012) (unofficial rough transcript).  Neither the Fifth Circuit nor the Second Circuit explicitly addressed the issue of ORB omissions on the high seas, but after further review of the lower court opinions in both cases, the Court finds that the government was correct that both *Ionia Management* and *Jho* did involve ORB omissions on the high seas.  *See United States v. Ionia Mgmt., S.A.*, 498 F. Supp. 2d 477, 480 (D. Conn. 2007) (noting that defendants were charged with "failing to disclose exceptional discharges of oil" and "omitted entries required to be recorded of overboard discharges"); *United States v. Jho*, 465 F. Supp. 2d 618, 623, 642–45 (E.D. Tex. 2006) (noting and discussing charges of "failing to disclose exceptional discharges"), *rev'd*, 543 F.3d 398 (5th Cir. 2008).  This fact bolsters, in the Court's mind, the applicability and persuasiveness of *Ionia Management* and *Jho* in the context of this case.

Indeed, the Southern District of Florida recognized this same principle in a prosecution analogous to the instant one. *See United States v. Royal Caribbean Cruises, Ltd.*, 11 F. Supp. 2d 1358 (S.D. Fla. 1998). In *Royal Caribbean*, the defendant was prosecuted for violations of 18 U.S.C. § 1001 for making false ORB entries onboard its vessel. That statute makes it a crime knowingly and willfully to "make[] any materially false, fictitious, or fraudulent statement or representation," or to "make[] or use[] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a). The Court notes that 18 U.S.C. § 1001 is substantially similar to 18 U.S.C. § 1519, which the defendants are charged with violating in this case.[6]

The defendant in *Royal Caribbean* argued that, because the duty to make entries under APPS "occurs at the time of the discharge," the United States could not impose a duty on the defendant to make any entry in its ship's ORB with respect to any given alleged discharge on the high seas. *Id.* at 1363. Thus, the defendant argued, the United States could not prosecute it for "mak[ing] or us[ing] a[] . . . materially false, fictitious or fraudulent statement or entry" by virtue of its failure to comply with the charged duty in that case, i.e., the duty to make accurate ORB entries. *See id.*

The court disagreed, holding that "the fact that the alleged false statement in a § 1001 case was not made within the jurisdictional bounds of the United States is not necessarily fatal to the claim," and that "even if the statement is arguably true at the time it was made in the location it was made, if the statement is false *as a matter of United States law* and fulfills the other requirements for a § 1001 claim, it is actionable." *Id.* (emphasis added). The court further

---

[6] In fact, the Court notes that the language of the Superseding Indictment closely tracks the language of 18 U.S.C. § 1001 by charging that the defendants "did knowingly conceal, cover up, and falsify, and make a false entry in a record or document, that is, a false, fictitious, and misleading Oil Record Book." *See* Superseding Indictment at 14, 16.

concluded that the United States had jurisdiction to prosecute, under §1001, omissions in an ORB which, even if not false on the high seas, were false under United States law.  *Id.* at 1364. To hold otherwise, the court noted, "would raise serious questions about the government's ability to enforce, as a matter of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases," where the false statements at issue "were made outside the United States, perhaps acceptable or in the alternative unnecessary under the appropriate foreign regulatory scheme, but nonetheless illegal under United States law."  *Id.*[7]  Importantly, the court also noted that it was "not necessary to reach the question of the obligation of [the defendant] to record various entries in the [ORB] while outside the jurisdiction of the United States" or "the attendant ability of the United States to enforce any omissions thereof" in order to conclude that the defendant had an obligation "not to knowingly and willfully present a false writing to the United States Coast Guard."  *Id.* at 1366.

The Court finds the reasoning of *Royal Caribbean* persuasive and directly applicable both to the facts presented and the arguments made in this case, and therefore the Court holds that the law-of-the-flag doctrine does not bar the United States from prosecuting the defendants for their failure to make entries in the ORB of the *San Nikunau*.[8]  This result stems from the fact that the term "maintain" in the APPS contemplates more than a mere duty to record a discharge of oily bilge waste on the high seas, divorced from the commercial purposes and future plans of the vessel.  The word "maintain" in the sense it is used in the APPS means "[t]o keep up, preserve [and] cause to continue in being," *see* 9 OXFORD ENGLISH DICTIONARY 223 (2d ed. 1989), and

---

[7] The court noted as "an alternate basis for jurisdiction" under § 1001, "the extraterritorial doctrine providing jurisdiction over certain extraterritorial offenses whose 'extraterritorial acts are intended to have an effect within the sovereign territory.'"  *Royal Caribbean*, 11 F. Supp. 2d at 1364 (quoting *United States v. Padilla-Martinez*, 762 F.2d 942, 940 (11th Cir. 1985)).

[8] For this same reason, and for the reasons discussed in Part II.C *infra*, the Court holds that the prosecution of individuals who fail to make entries in an ORB that are required under United States law and then bring that inaccurate ORB into United States ports, is "in accordance with international law" under 33 U.S.C. § 1912.

thus a vessel on the high seas has a duty to "keep up" its ORB and ensure that it "continue[s]" to be accurate in relation to the ports that it wishes to call on and with which it desires to engage in commerce.  This means that vessels like the *San Nikunau*—and the crewmembers responsible for maintaining the ORB aboard such vessels, *see* 33 C.F.R. § 151.25(j)— have a duty under the APPS to ensure that their ORBs are in compliance with United States law before they enter United States navigable waters.  If a vessel enters the jurisdiction of the United States with an ORB that omits entries required under the APPS, it clearly violates this duty and is subject to prosecution under United States law.

Defendants counter, however, that it "cannot be the case that, where international law requires the ORB to be completed in accordance with the flag State's MARPOL requirements, that U.S. regulations then require ships to re-write ORBs that are compliant on the high seas when they enter U.S. ports simply to satisfy the U.S. government's interpretations of its regulations."  Defs.' Mem. at 7.  Yet, what the defendants decry is precisely the nature of the *quid pro quo* described above.  The defendants purposefully sought out and enjoyed the privileges and benefits of engaging in commerce in United States ports on a significant scale, and the duty that accompanies those sizeable benefits is the requirement to "[update or maintain] ORBs that are compliant on the high seas when they enter U.S. ports [in order] to satisfy the U.S. government's interpretations of its regulations." [9]  This is the sovereign prerogative of the United States—to extend to foreign-flagged commercial vessels the privilege of calling on its ports "upon such terms and conditions as the government sees fit to impose."  *See Patterson*, 190 U.S. at 178.  Whether those "terms and conditions" require "rewriting" anything is the choice of the vessel—they can make the entries as the discharges occur on the high seas or they can "rewrite"

---

[9] The Court notes that this duty may not arise if a ship does not voluntarily or purposefully avail itself of United States ports, for example due to emergency, mistake, or other circumstances that are not present in this case.

14

the ORB at the eleventh hour, but in either case they must comply with their duty to maintain an accurate ORB.

Moreover, the interpretation that the defendants seek would fly in the face of the broad remedial purposes expressed by MARPOL and the APPS.  The 1973 Convention states that the parties desired "to achieve the *complete elimination* of intentional pollution of the marine environment by oil and other harmful substances and the minimization of accidental discharge of such substances."  MARPOL pmbl., 1340 U.N.T.S. 184 (emphasis added).  Additionally, the APPS specifically applies to "the ships of a country not a party to the MARPOL Protocol . . . to ensure that their treatment is not more favorable than that accorded ships to parties to the MARPOL Protocol."  33 U.S.C. § 1902(e).  Endorsing the rule proposed by the defendants would, contrary to the foregoing provisions, seem to create a race to the bottom for signatories of MARPOL, wherein vessels would have an incentive to raise the flag of whichever nation required them to make the fewest number of ORB entries and adopted the loosest interpretations of terms like "machinery space operations" and "disposal otherwise."

Endorsing the defendants' view would also severely frustrate the United States government's ability to enforce MARPOL's requirements.  Not only would the government need to investigate the nuances of other signatories' interpretations of MARPOL before detaining certain foreign-flagged vessels, but they would also be forced, in cases where a flag State's interpretation was more lenient, to forego their strongest weapons in deterring MARPOL violations, i.e., criminal prosecution, forfeiture, and barring from port.  *See Jho*, 534 F.3d at 403 (noting that if ORBs did not have to be maintained while in United States ports or navigable waters, "the Coast Guard's ability to conduct investigations against foreign-flagged vessels

would be severely hindered, and the regulation would allow polluters (and likely future polluters) to avoid detection").

> ### C.   Is There a Conflict Between United States MARPOL Law and New Zealand MARPOL Law?

Finally, the defendants also impliedly raise an interesting question:  If a flag State's MARPOL regulations materially differ from United States MARPOL regulations, is it unfair or improper (or both) to subject a foreign-flagged vessel to United States regulations when the vessel enters a United States port?  This is certainly a fair question, the answer to which likely depends upon a careful balancing of the delicate and important interests of comity and sovereignty, but in this case no such balancing is necessary because the Court finds that there is likely no conflict between United States and New Zealand MARPOL regulations.

"Issues of foreign law are questions of law."  FED. R. CRIM. P. 26.1.  In deciding such questions, the Court is permitted to consider an extremely broad universe of information to determine an issue of foreign law in a criminal case, which includes "any relevant material or source—including testimony—without regard to the Federal Rules of Evidence."  *Id.*

By way of background, New Zealand adopted domestic legislation implementing MARPOL when it passed the Maritime Transport Act ("MTA") in 1994.  That statute states that "[h]armful substances shall not be discharged or escape [into the sea], otherwise than in accordance with the marine protection rules."  Marine Transport Act § 226 (N.Z.).  The MTA also imposes a duty upon a ship's owner and master to report any "discharge or escape of a harmful substance into the sea . . . in accordance with the requirements of the marine protection rules."  *Id.* § 227.  The MTA defines "harmful substance" and "discharge" as however those terms are defined in the Marine Protection Rules ("MPRs").

The MPRs are administrative regulations promulgated by the Ministry of Transport of New Zealand—more particularly an agency of the Ministry called Maritime New Zealand ("MNZ"). The MPRs define "harmful substance" as including "oil," which is further defined as "petroleum in any form including crude oil, oil fuel, sludge, oil refuse and refined products."[10] Marine Protection Rules, pt. 122.2. Two subsets of "oil" in the MPRs are (1) "oily bilge water," which is defined expansively as "water that may be contaminated by oil resulting from things such as leakage or maintenance work in machinery spaces and, for the avoidance of doubt, includes any liquid entering the bilge system, including bilge wells, bilge piping, tank tops, or bilge holding tanks";[11] and (2) "oily mixture," which is defined as "a mixture with any oil content."[12] *Id.* They further define "discharge" as "any release, disposal, spilling, leaking, pumping emitting or emptying." *Id.*[13]

1.     Regulation of the Discharge of Oil and Oily Mixtures

The two portions of the MPRs most relevant here are Parts 120 and 123B, which deal with the discharge of oil and the maintenance of ORBs, respectively. Part 120 of the MPRs is the New Zealand counterpart to 33 C.F.R. § 151.10. Part 120 makes it illegal to discharge "oil or oily mixture from any ship" unless "the ship is proceeding en route," the "oil content of the effluent without dilution does not exceed 15 parts per million," and "the ship has the appropriate oil filtering equipment, for that ship, in operation." The language of 33 C.F.R. § 151.10, on the other hand, prohibits "any discharge of oil or oily mixtures into the sea" unless "the ship is

---

[10] This definition is nearly identical to the definition of "oily mixture" in in the Coast Guard regulations, except the Coast Guard regulations say "in solid, semi-solid, emulsified, or liquid form" instead of "in any form," and they add the term "oil residue" to the non-exclusive list of examples of "oil." 33 C.F.R. § 151.05

[11] The term "oily bilge water" is not defined in 33 C.F.R. Part 151, Subpart A.

[12] This definition is nearly identical to the definition of "oily mixture" in the Coast Guard regulations, except the Coast Guard regulations add the clause "in any form" to the middle of the definition. *Id.*

[13] This definition is nearly identical to the definition of "discharge" in the Coast Guard regulations, except the Coast Guard regulations add the word "escape" to the list of defining terms. *Id.*

proceeding en route," the "oil content of the effluent without dilution is less than 15 parts per million," and "the ship has in operation oily-water separating equipment, a bilge monitor, a bilge alarm, or combination thereof."  33 C.F.R. § 151.10.[14]

Plainly, the language of these two regulations is nearly identical, other than three small differences.  First, the MPRs cover discharges "from any ship," while the Coast Guard regulations cover discharges "into the sea," but if anything this means that the MPRs cover *more* conduct than the Coast Guard regulations, not less.  Second, the Coast Guard regulations require the oil content of the effluent to be "less than 15 parts per million," while the MPRs require that the oil content "not exceed 15 parts per million," resulting in a maximum of one extra oil part per million water parts under New Zealand law.  Finally, the MPRs require "appropriate oil filtering equipment" to be in operation, rather than the "oily-water separating equipment," "bilge monitor," and "bilge alarm" required by the Coast Guard regulations.  It is unclear, however, what material difference this would make for a ship like the *San Nikunau* because the MPRs require "oil filtering equipment" that is once again practically identical to the equipment described in the Coast Guard regulations, including "an alarm to indicate" and "arrangements to ensure" that "any discharge of oily mixtures is stopped automatically when the oil content of the outflow exceeds 15 parts per million" for ships that "remain[] at sea for extended periods." Marine Protection Rules pt. 122.4.

2.   Regulation of Oil Record Books

Part 123B of the MPRs is the New Zealand counterpart to 33 C.F.R. § 151.25.  Under Part 123B, all ships must "ensure that an Oil Record Book is carried on board the ship."  Marine

---

[14] The Court notes that there are other, minor differences between 33 C.F.R. § 151.10 and MPR Part 120, but the Court does not consider them material to the facts of this case as the Court currently understands them.  *See, e.g.,* 33 C.F.R. § 151.10(a) (requiring that, in order to discharge oil or oily mixtures, the oil or oily mixture must not "originate from cargo pump room bilges," or be "mixed with oil cargo residues," and the ship must not be "within a special area").

Protection Rules pt. 123B.4.  Part 123B.5(2) requires that a "full record" be entered "without

delay" of any operation described in Part 123B.5(1).  *Id.* pt. 123B.5(2).  Thus, inserting the

requirements of Part 123B.5(2) into Part 123B.5(1), the latter Part provides that:

> The owner and the master of any ship to which this rule applies must ensure that
> [a full record is entered without delay in the] Oil Record Book . . . on a tank-to-
> tank basis if appropriate, whenever any of the following operations take place in
> the ship—
>
> (a) for machinery space operations (all ships):
>
>> (i)   ballasting or cleaning of oil fuel tanks:
>>
>> (ii)  discharge of dirty ballast or cleaning water from tanks referred to in
>>       rule123B.5(1)(a)(i):
>>
>> (iii) disposal of oil residue (sludge):
>>
>> (iv) discharge overboard or disposal otherwise of bilge water which has
>>       accumulated in machinery spaces

*Id.* pt. 123B.5(1).  To facilitate a side-by-side comparison of these two provisions, the relevant

portion of 33 C.F.R. § 151.25(d) reads as follows:

> Entries shall be made in the Oil Record Book on each occasion, on a tank to tank
> basis if appropriate, whenever any of the following machinery space operations
> take place on any ship to which this section applies—
>
> (1) Ballasting or cleaning of fuel oil tanks;
>
> (2) Discharge of ballast containing an oily mixture or cleaning water from fuel oil
>     tanks;
>
> (3) Disposal of oil residue; and
>
> (4) Discharge overboard or disposal otherwise of bilge water that has accumulated
>     in machinery spaces.

33 C.F.R. § 151.25(d).  The Court concludes that it is so plain that there are no material

differences in the language used between these two provisions that the Court will not bother with

any further textual analysis.  Any differences are entirely semantic.

The defendants respond, however, that, just because the language of these provisions is

virtually identical, does not mean it can be presumed "that the details of each Party's

implementation of MARPOL and interpretation of its requirements is identical to that of the United States government, especially when the issue relates to the interpretations of key terms such as 'machinery space' or 'disposal otherwise.'"  Defs.' Reply at 4.  The defendants argue that two categories of operations were not required to be recorded under Part 123B.5:  (1) intra-vessel tank-to-tank transfers of oil or oily bilge water; and (2) bilge discharges from the vessel's bow thruster bilge, the pipe alley, the ammonia room, the wet deck, or the steering gear room. *See id.*  Based on the structure of the defendants' arguments, it appears that they claim that category (1) would not require recordation in the ORB because intra-vessel tank-to-tank transfers are not considered "disposal[s] otherwise" under the MPRs and that category (2) would not require recordation in the ORB because the listed areas are not considered "machinery spaces" under the MPRs.

Taking category (1) first, the defendants' position that New Zealand regulators "did not expect or require the crew of the *Nikunau* to record intra-vessel tank-to-tank transfers" directly contradicts the language used in the MPRs.  Part 123B.5 clearly states that entries in the ORB must be made "on a tank-to-tank basis if appropriate."  Thus, it would seem that New Zealand regulators would indeed expect and require that such intra-vessel tank-to-tank transfers be recorded in the ORB "if appropriate."  Reading Part 123B.5 in light of its structure, the Court finds that "if appropriate" most naturally refers to a situation where at least one of the tanks is a "machinery space" and the substance being transferred is "oily bilge water."  The exact same "tank to tank" language appears in 33 C.F.R. 151.25, and it strains credulity to conclude that New Zealand would ignore this language entirely, or that New Zealand and United States authorities would read the English language in such wildly divergent ways.

As to category (2), although the defendants are correct that the elusive term "machinery space" lacks formal definition anywhere in MARPOL, APPS, Coast Guard Regulations, the MTA, or the MPRs, the Court has nevertheless located helpful guidance to assist it in making a determination of New Zealand law on this issue under FED. R. CRIM. P. 26.1.  As an initial matter, MNZ (the New Zealand agency primarily responsible for developing and promulgating the Marine Protection Rules) paints a very different picture of its regulatory philosophy than what the defendants would have the Court believe.  In an informal agency document describing its mission and goals, MNZ suggests generally that it strives to interpret MARPOL's terms consistently with other signatory nations, stating that the MPRs it promulgates are "made to reflect international standards set by the International Maritime Organization, promoting consistent levels of maritime safety and marine protection around the world."[15]

Furthermore, in an informal policy document published by MNZ entitled "Your Guide to Marine Protection Rules," MNZ equates "machinery space" with any area on a vessel that creates "oily bilge water."[16]  In particular, the document states, in discussing Part 120:  "The permitted discharges differ according to whether the oil is the residue of a cargo carried by an oil tanker, or drainage from the machinery space of a ship (oily bilge water)."[17]  As discussed above, "oily bilge water" is defined in the MPRs as "water that may be contaminated by oil resulting from things such as leakage or maintenance work in machinery spaces and, for the avoidance of doubt, includes *any liquid entering the bilge system*, including bilge wells, bilge piping, tank tops, or bilge holding tanks."  Marine Protection Rules pt. 122.2 (emphasis added).

---

[15] *See* Maritime New Zealand, "Who We Are" at 6 (2009), available at http://www.maritimenz.govt.nz/Publications-and-forms/Maritime-NZ-corporate-publications/Maritime-New-Zealand-profile.pdf

[16] *See* Maritime New Zealand, "Your Guide to Marine Protection Rules" at 9 (2010), available at http://www.maritimenz.govt.nz/Publications-and-forms/Environmental-protection/Guide-Marine-Protection-Rules.pdf

[17] *Id.*

Additionally, the definition of "oily bilge water" standing alone supports the notion that "machinery spaces" likely encompasses any space that is part of a vessel's bilge system because "oily bilge water" is water contaminated with oil due to "leakage or maintenance work in machinery spaces" but also generally includes "any liquid entering the bilge system." *Id.* Putting these pieces of information together, the Court finds that MNZ would likely consider areas like bow thruster bilges, pipe alleys, ammonia rooms, etc. to be "machinery spaces" whose bilge discharges require entries in an ORB.

The point of this exercise in comparative international environmental law demonstrates two things. First, it demonstrates that whether United States or New Zealand MARPOL regulations were to be applied to the defendants' conduct in this case, it would likely make no material difference. Second, and relatedly, it demonstrates that although the defendants complain that they are being unfairly subjected to the peculiar rules of a foreign sovereign, the text of New Zealand's regulations (and policy guidance) appear to show that the equities in fact tip the other way. Because New Zealand MARPOL regulations in this area appear on their face to be functionally identical to those of the United States, the defendants curry little sympathy in claiming that they did not know or expect to be held to the "broad and unprecedented interpretations" of MARPOL imposed upon them by the government in this case. *See* Defs.' Mem. at 2. In sum, these striking similarities between New Zealand and United States MARPOL regulations confirm that it is not only legally proper to apply United States law to the defendants' conduct, but it is also entirely fair.

## III.    CONCLUSION

For the reasons stated above, the Court concludes that United States law applies to the conduct charged in the Superseding Indictment, that the defendants are subject to prosecution for

those crimes with respect to all of the conduct charged in the Superseding Indictment, and that,

as a result, the Court declines to accept the defendants' proposed modifications to the jury

instructions on the APPS.  An Order consistent with this Memorandum Opinion shall be

entered.[18]


Date:  July 27, 2012


/s/ *Beryl A. Howell*
_____
BERYL A. HOWELL
United States District Judge

---

[18] The defendants have stated that they "will be prepared to introduce evidence to demonstrate that the crew of the *Nikunua* were not required under New Zealand MARPOL laws, regulations, practices and procedures to record intra-vessel tank-to-tank transfers or bilge discharges from the vessel's bow thruster bilge, the pipe alley, the ammonia room, the wet deck or the steering gear room."  Defs.' Reply at 5.  This testimony would consist of a "surveyor for SGS NZA"—a private New Zealand corporation that "regularly inspected the *Nikunau* during the time period relevant to the Superseding Indictment to ensure that the vessel was in compliance with its Safe Ship Management Certificate," and also issued the vessel "fit for purpose certificates" and its "International Oil Pollution Prevention ('IOPP') certificate."  *Id.* at 4–5.  The government has likewise requested that a hearing be held outside the jury's presence prior to this witness being allowed to testify in order to address the testimony's relevance.  Gov't Reply ay 3.  As the above discussion reveals, the Court is skeptical that this testimony will be able to show what the defendants claim—particularly because the witness is not an agent of any New Zealand law enforcement agency and likely could not testify authoritatively about the government's official interpretation of its MARPOL regulations—or whether the testimony would be relevant in light of the above rulings on the applicability of the APPS, but the Court will reserve final judgment on the admissibility of the defendants' proposed witness (and whether a hearing will be held on that issue) until the parties have had a fuller opportunity to present their evidence at trial.